**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Matthew Gerardot,<br><br>Plaintiff,<br><br>v.<br><br>LAFARGE S.A., LAFARGE CEMENT HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **JURY TRIAL DEMANDED**<br><br>**CASE NO.** |

## INTRODUCTION

1. On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for conspiring to provide material support to a terrorist organization. According to Deputy Attorney General Lisa O. Monaco, Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Syria S.A. ("LCS") (collectively, "Defendants") "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."[1]

2. As part of its plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"), which Plaintiff incorporates into this Complaint in its entirety to the extent not inconsistent with the allegations herein. *See United States*

[1] Plaintiff incorporates by reference and recites in this Complaint many of the relevant allegations made in the Fourth Amended Complaint in the matter *Finan v. Lafarge S.A.*, No. 1:22-cv-07831 (E.D.N.Y), Dkt. No. 140.

*v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10. Lafarge and LCS agreed in the guilty plea that they "will not dispute the Statement of Facts."

3. Among the facts to which Defendants admitted was that they paid ISIS and Al-Nusra Front ("ANF") nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement.

4. The money paid by Defendants to ISIS went directly to ISIS's operations, including its acts of international terrorism. As an Assistant Attorney General said in announcing the plea, Lafarge "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations – ISIS and al-Nusrah Front in Syria – at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."

5. Documents indicate that Defendants paid millions of dollars, starting before July 2012, and did not take steps to unwind the conspiracy until years later, after the criminal conspiracy was publicly exposed.

6. Defendants were able to conceal their conspiracy with ANF, ISIS, and their intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States. They undertook these activities in the United States purposefully to avoid the scrutiny of Lafarge's French auditors and law enforcement officials, and to avoid having to engage in banking transactions in or through Syria and in Syrian currency.

7. The Plea Agreement states, Lafarge's "criminal conduct" was "not voluntarily self-reported to the Department of Justice," which "did not receive timely and full cooperation with [its] investigation."

8. The factual admissions in the Statement of Facts established Defendants' criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under the ATA, 18 U.S.C. § 2333.

9. Because Defendants conspired with ISIS, which engaged in international acts of terrorism, and their intermediaries, Defendants must pay compensation to the survivors. In this civil action under the ATA, Plaintiff, an American citizen harmed by ISIS's acts of international terrorism committed in conspiracy with Defendants seeks to collect the treble damages authorized by the ATA for Defendants' violations thereof.

10. Plaintiff Matthew Gerardot was a Master Seargent in the Army who worked in Special Operations in Syria.

11. During one of these missions, on August 14, 2016, Plaintiff attempted to enter a former command post of ISIS, triggering an explosive device, which ISIS had left as a trap.

12. As a result of the explosion, Plaintiff was severely injured by the ISIS explosive device. He sustained serious injuries across his body, significant hearing loss in one ear, a damaged retina, extensive shrapnel wounds, and a traumatic brain injury. He had multiple surgeries.

13. Plaintiff was awarded the Silver Star (in 2018) and the Purple Heart for his service in Syria.

14. The ISIS attack that severely injured Plaintiff, like ISIS's attacks on other U.S. servicemembers, was intended to influence the government of the United States and the governments of coalition partners.

15. The Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016), has been interpreted to allow any applicable statute of limitations to start running on September 28,

2016, even when the injury giving rise to the cause of action accrued prior to that date. *See Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567, 580 (S.D.N.Y. 2025) ("The unambiguous language of JASTA makes clear that within ten years of its [September 28, 2016] enactment, a plaintiff can bring suit under JASTA for any relevant injury that occurred on or after September 11, 2001.")

**BACKGROUND**

16. After investing $680 million to construct a cement plant in northern Syria ("Cement Plant"), Defendants faced a critical moment in 2011. Conflict in Syria had devolved into an all-consuming civil war, and terrorist groups were imposing their will on the population. Unlike other multinational companies, which halted their Syrian operations and fled the country, Defendants saw opportunity in partnering with the terrorists and pursuing shared purposes.

17. At the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries at the same time ISIS was killing Americans. For the explicit purpose of incentivizing ISIS to act in a manner that would promote their common interests, Defendants' executives agreed to make monthly payments to ISIS and ANF, to pay ISIS based on the volume of cement LCS sold, to purchase raw materials from ISIS-controlled suppliers, and to sell its cement to ISIS. Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement. Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.

18. Defendants received crucial benefits in exchange for these payments. ISIS permitted access to raw materials sourced from the expanding territory and markets under its control so that the Cement Plant could produce cement; ISIS allowed LCS employees, suppliers,

and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey.

19. Defendants' knowing provision of material support to ISIS enabled ISIS to expand the territories and markets under its control, fund low-cost acts of terrorism directed at Americans, and build the infrastructure necessary to injure or kill American citizens.

20. Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

21. Defendants were fully aware that they were transacting with ANF and ISIS, and that their conduct flagrantly violated U.S. law.

22. To avoid detection, Defendants went to great lengths to conceal their relationship with ANF and ISIS. For one thing, rather than directly transacting with terrorists, Defendants worked through intermediaries. As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS. But via [intermediaries], we did in fact contribute to the economy of ISIS." Relatedly, Defendants ensured that documents regarding terrorist payments did not reference the word "Lafarge." Finally, Defendants purposefully availed themselves of U.S. dollar transactions routed through the U.S. financial system and personal email addresses using services based in the United States—rather than Lafarge email addresses—to conceal their illegal activities from their auditors and French law enforcement authorities.

23. Defendants have admitted making payments of at least $5.92 million to ISIS and ANF from 2012 through 2014. These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold. Defendants have also admitted

to leaving behind cement when they turned over the factory to ISIS, and that ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

24. In addition, Lafarge entered into a written contract in October 2014, back-dated to September 2014, obligating it to continue to make U.S. dollar payments indefinitely, money destined for terrorists.

25. Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. The revenue stream enabled the terrorist attacks that targeted Plaintiff. Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts, including the attack that severely injured Plaintiff. It allowed ISIS to create more explosives, capture more territory, recruit new members, and expand to new regions and countries. According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

26. Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities. Their multimillion-dollar bribes were enough to finance *thousands* of ISIS terrorist attacks. These attacks were the foreseeable, obvious and even intended results of doing business with ISIS. Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets. The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

27. Defendants' payments were channeled to ISIS's leadership, under ISIS's centralized and carefully tracked system. ISIS's founder and leader Abu Bakr Al-Baghdadi supervised the collection and disbursement of the "taxes" Defendants paid to it. On information

and belief, Al-Baghdadi's ISIS Leadership Cell skimmed 20% off the top of the money ISIS collected, including the payments made willingly by Defendants, to help plan, authorize, and commit the terrorist acts alleged below. In addition, Lafarge was located near the main ISIS headquarters in Raqqa. The rest of Lafarge's money would have gone to the Raqqa province, led by the Raqqa Cell. The Raqqa Cell, in turn, was run by Ali Musa Al-Shawakh, or Abu Luqman, and played a key role in maintaining fighters, funding, and planning the attacks described below. Lafarge, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman's Raqqa Cell, which controlled the local territory around Lafarge's cement plant in northern Syria. The Raqqa Cell collected funds from Lafarge and directed and/or perpetrated the individual attacks that harmed or killed American citizens, including the attack that severely injured Plaintiff.

28. Defendants' scheme depended on connections to the United States. Throughout, Defendants exploited New York's banking system by executing U.S.-dollar wire transfers they caused to clear through New York. That was no coincidence. Defendants chose to pay in U.S. dollars – they called "USD" their "preferred option" – and they deliberately routed their wires through New York banks. By using New York correspondent banks to clear those U.S.-dollar wires, Defendants advanced their criminal scheme: they made the payments look legitimate; avoided the operational risks posed by unreliable foreign-clearing options; supplied the terrorists with their preferred currency; and hedged against the foreign-exchange risk posed by the collapsing Syrian pound. New York clearing helped them capture all those benefits. Defendants used New York clearing when they could, and in a manner that was carefully designed to avoid triggering U.S. sanctions. And they knew, as Lafarge's accounting manager explained in one

illustrative email, that their U.S.-dollar wires required the involvement of "US correspondent bank[s]."

29. Defendants also formed U.S. contacts by deliberately relying on American email providers to communicate about their terrorist payoffs.

30. Defendants' conspiracy itself was integrally linked to the United States, as Defendants knew, foresaw, and intended. Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power, territory and markets. By taking on the world's strongest power, the United States, and killing Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach. Defendants intentionally, purposefully, and foreseeably benefitted from ISIS's protection, strength, and terrorist acts against Americans as part of their partnership with ISIS to control local markets and increase profits.

31. Thus, Defendants entered a conspiracy with ISIS and intermediaries whose overall object was to maintain and expand ISIS's territorial control of Syria and Iraq and thereby promote ISIS's control of and protection rackets within that territory. ISIS's acts of international terrorism targeting U.S. servicemembers, including the attack that severely injured Plaintiff, furthered the overall object of Defendants' conspiracy by strengthening ISIS's perceived power.

32. Plaintiff is an American citizen who was harmed by ISIS and is entitled to recover for the economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss experienced as a result of Defendants' misconduct. Defendants conspired with ISIS, ANF, and intermediaries, making Defendants liable for the terrorist attacks that ISIS and ANF foreseeably committed in furtherance of their conspiracy, including the attack that severely injured Plaintiff.

## THE PARTIES AND PRINCIPAL CO-CONSPIRATORS

33. Plaintiff was in Syria in 2016, serving as an Army Master Sergeant, working in Special Operations. Mr. Gerardot is a citizen of the United States and domiciled in the state of South Carolina.

34. He was severely wounded by an ISIS explosive device (IED) on August 14, 2016, while supporting Kurdish forces to encircle and liberate Manbij, Syria.

35. In Syria, Plaintiff was based at the LCF (LaFarge Concrete Factory) Syria. Plaintiff, participated in the Battle for Manbij, a major Syrian city and ISIS strong hold. Among other things, Plaintiff was responsible for the sensitive site exploitation (SSE) of ISIS positions, including ISIS Government Buildings, bomb and weapons manufacturing facilities, vehicle modification facilities, military command and control, and prisons to gather information about ISIS.

36. Plaintiff, who is not a medic or doctor, was tasked with providing medical support for the coalition front lines, which included injured and maimed civilians who ISIS deliberately pushed into battle as cannon fodder to confuse coalition front lines and create political fallout for coalition forces.

37. On one of these missions, an IED that ISIS had set as a trap for coalition forces detonated and severely injured Plaintiff.

38. As a result of the explosion, Plaintiff sustained severe injuries across his body, significant hearing loss in one ear, a damaged retina, extensive shrapnel wounds, and a traumatic brain injury.

39. ISIS systematically left explosive devices across the entire city of Manbij.

40. **Defendant Lafarge S.A.** ("Lafarge") is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people

to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.

41. On July 10, 2015, Lafarge merged with its leading competitor, Holcim, Ltd., a Zurich, Switzerland-based building materials business to create LafargeHolcim. At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.

42. During all times pertinent to this Complaint, Lafarge oversaw and directed the conduct of two Defendant subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

a. **LCS** was a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned 98.7% of LCS through four subsidiaries, primary among them Lafarge Cyprus. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqa, Syria. LCS made agreements and effectuated transactions with ISIS and ANF "at the direction of LAFARGE's and LCS's senior management," including a Lafarge Executive Vice President based in Paris. Lafarge executives were thoroughly informed of LCS's decisions and directions in interacting with terrorists. When allegations herein refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

b. **Lafarge Cyprus** is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim Ltd. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments

to ISIS and ANF. Lafarge Cyprus's financing of LCS's transfers was done knowingly and at Lafarge's direction and with Lafarge's approval. In 2014, Lafarge Cyprus executed a consulting agreement with a Syrian intermediary to conceal Defendants' payments to ISIS.

43. Defendants, through the work of certain executives, officers, consultants and others, acted in concert with, and for the purpose of furthering Defendants, ISIS's, and ANF's common objectives. They conspired and worked in concert with ANF and ISIS, with the full knowledge of ANF's and ISIS's designation as Foreign Terrorist Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of Americans and others.

## JURISDICTION AND VENUE

44. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

45. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) and 18 U.S.C. § 2334(a).

46. Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction pursuant to Rule 4(k)(2), because Defendants would not be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate.

47. Plaintiff references the Court's prior order on personal jurisdiction in related cases, holding that "under the broader reading of federal jurisdiction for matters concerning the United States as a sovereign embraced by the Supreme Court in *Fuld*, Rule 4(k)(2) provides a proper basis for this court's exercise of personal jurisdiction over Defendants." *Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *16 (E.D.N.Y. Aug. 29, 2025), motion to certify appeal denied, No. 22-CV-7831 (NGG) (PK), 2025 WL 2961469 (E.D.N.Y. Oct. 20, 2025), and

reconsideration denied, No. 22-CV-7831 (NGG) (PK), 2025 WL 3017793 (E.D.N.Y. Oct. 29, 2025).

48. Specifically, this Court further noted that "the [*Fuld*] Court reasoned that it is the political branches' prerogative, and not the courts', to tailor federal courts' jurisdiction in such a way that permits defendants to be sued in federal courts for their 'conduct closely related to the United States that implicates important foreign policy concerns.'" *Id*. (quoting *Fuld*).

49. Plaintiff also notes the following facts.

50. Defendants' conspiracy with ANF and ISIS and intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and their agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists, including via intermediaries. Defendants "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.

51. Specifically, Defendants directed their banks to complete U.S.-dollar-denominated wire transfers to support their scheme to fund ISIS and ANF, and Defendants' officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District. Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions. On information and belief, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

52. By routinely, purposefully, and knowingly conducting transactions in U.S. dollar-denominated transactions processed through New York, Defendants purposefully availed themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

53. As Defendants knew and intended, Defendants' conspiracy with ANF and ISIS and intermediaries enabled ANF and ISIS to commit the acts of international terrorism that expanded ISIS's power and territorial control that benefitted Defendants, and that injured victims in Syria and injured Plaintiff.

54. In addition, as described further below, Defendants conspired with ISIS and its intermediaries to (a) provide material support to ANF and ISIS, designated terrorist organizations, knowing and intending that ANF and ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a); and (b) commit acts of terrorism, knowing and intending that ISIS would target American citizens and American interests, including servicemembers, in violation of 18 U.S.C. 2333(d). Defendants and their co-conspirators and agents' conspiracies had a substantial connection to and were in and affecting the United States and, in particular, New York.

55. In furtherance of the conspiracies, Defendants purposefully made numerous U.S.-dollar payments to ISIS through intermediaries and to facilitate the conspiracy with ISIS and intermediaries, payments that were wired through New York. This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

56. Also in furtherance of the conspiracies, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS. U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities.

57. Further, Defendants participated in a scheme and conspiracy with ISIS and intermediaries that was directed at the United States and whose overall object was to maintain ISIS's territorial control of Syria and Iraq.

58. ISIS was public about its intent to commit acts of terrorism against the United States as well as its intentional recruitment from the United States. In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started." In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation." And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and "soon enough, you will be in direct confrontation—forced to do so, God willing."

59. The threat to U.S. citizens inside Syria was well-known outside of Syria, as well. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

60. A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

61. In addition, other ISIS members have been tried and convicted in this District. For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership. Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York. In 2022, Kandic was convicted of five counts of providing material support to ISIS, and one count of conspiracy to do the same. Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York, was convicted in the Eastern District of New York for providing material support to ISIS. Asainov fought with ISIS as a sniper from 2013 until he surrendered in 2019, rising in ISIS's ranks to become the lead trainer and organizer of ISIS's sniper force. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," of which Raqqa governor Abu Luqman was a member.

62. ISIS's overt acts targeted the United States, American servicemembers, and other U.S. citizens. Lafarge bought protection and entered a complex conspiracy with ANF and ISIS and intermediaries, with the awareness that they were terrorist-classified groups. Lafarge conspired with full knowledge of and intent to enable their terrorist acts, including their targeting of the United States, its interests and its citizens, in order to control markets and increase profits. As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States, U.S. interests and U.S. military, including Plaintiff are attributable to Defendants.

63. Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants

with conspiring to provide material support to terrorists. The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States." Based on these contacts with the United States, Lafarge and LCS "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action."

## FACTUAL ALLEGATIONS

### I. ISIS WAS THE WORLD'S MOST RUTHLESS TERRORIST GROUP

64. In March 2011, after anti-government protests associated with the Arab Spring had spread across the region, Syrian police detained and tortured teenage protestors. As mass protests erupted across the country, armed militias arose in the following months, with the goal of overthrowing the Syrian government. Syria quickly descended into a full-scale civil war.

65. In August 2011, seeing an opportunity among the numerous armed factions battling in Syria, Al-Qaeda in Iraq ("AQI") and Islamic State of Iraq ("ISI") leader Abu Bakr Al-Baghdadi sent AQI operative Abu Muhammad Al-Julani into northeast Syria to organize the network of militant jihadist cells in Syria into one cohesive group. Al-Julani's Al-Qaeda sub-group in Syria, ANF spread terror throughout the region.

66. On December 11, 2012, the United States amended the FTO and Executive Order (E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes." To date, ANF remains a designated FTO.

67. Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate."

68. Al-Julani, ANF's head, objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership. On May 15, 2014, when the Secretary of State amended AQI's designation to rename it the "Islamic State of Iraq and the Levant," the Secretary also amended that designation to remove ANF's aliases, and at the same time, separately designated ANF as its own FTO and Specially Designated Global Terrorist.

69. ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory. Through brute force, ISIS took the upper hand and rapidly seized Raqqa and other cities and villages across Syria and Iraq.

70. Unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone: its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire. The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence. ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance. It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers including the United States. Its acts of mass terrorist violence violated international law, including the laws of war.

71. Many of ISIS's acts were intended to intimidate and silence its opponents. Its fighters patrolled the streets with weapons and suicide vests. To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares. According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control."

72. It soon became clear ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters. ANF leaders began defecting to ISIS.

73. Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks. Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as Lafarge's security consultant called them) came to Syria and Iraq to join the group and commit terrorist attacks. It is with this group that Defendants chose to enter a complex set of multi-million-dollar financial arrangements with ISIS for their mutual benefit.

74. Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria, ruling over more than 11 million people.

75. Over 40,000 foreign fighters interested in ISIS's extreme ideology flocked to join its ranks in Iraq and Syria. They included members of terrorist groups that had fought in civil conflicts in their own countries in the chaos following the Arab Spring. For example, following Libya's collapse, Libyans with violent Islamist ideologies joined ISIS in Syria, hoping to help Syrians depose their own leader. By December 2013, Libyans were in the top five foreign

nationalities fighting with ISIS in Syria. Not only did these foreign fighters become well-connected within ISIS's network, but they learned its heinous techniques, including murdering civilians, seizing property and extorting local populations, and building explosives.

76. On May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of E.O. 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL").[2] The Secretary of State also added the aliases The Islamic State of Iraq and Al-Sham ("ISIS," which is how the FTO is referenced herein); The Islamic State of Iraq and Syria; ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production. ISIS remains a designated FTO to the present.

77. Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU," and that moreover "in LCS we knew that Al-Nusra Front had been listed by the Americans."

78. To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money. ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

79. Capturing cement plants was an essential part of ISIS's growth plan. Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue. Cement plants were a particularly appealing target for a number of

[2] The United States Secretary of State designated AQI as an FTO on October 15, 2004.

reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives, and cement to build tunnels and other structures used for attacks. ISIS had distribution networks it used to sell cement.

80. Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest. In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant. And ISIS did not simply capture and rob the Cement Plant. Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close partners, pursuing common objectives, and generating millions of dollars in profit for each.

## II. THE SYRIAN CIVIL WAR THREATENED THE CEMENT PLANT, SO DEFENDANTS PARTNERED WITH TERRORISTS

81. In 2007, Lafarge took a major step in its quest to dominate the Middle Eastern cement market. That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt. As part of the deal, Lafarge purchased the Cement Plant, which Orascom had started to build.

82. Lafarge and LCS completed the construction of the Cement Plant at the significant cost of $680 million. The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

83. At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, a senior executive at LCS requested that a then-minority shareholder, who was a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement. This individual became a critical intermediary for Defendants.

84. Less than a year later, however, the Cement Plant faced a more existential threat: the civil protests in Syria had erupted into a full-fledged civil war. In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from engaging in financial or insurance services for such transactions. The United States forbid imports of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

85. In 2012, as the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts. ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

86. As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria.

87. Defendants, by contrast, saw an opportunity in partnering with the terrorists in the battle for territorial control. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists to help them maintain and expand their control, instead of ending their operations in Syria.

88. In the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions.

89. By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF.

90. The situation became more critical in 2013. By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqa and both groups quickly established checkpoints at access roads to the Cement Plant. ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

91. On April 7, 2013, it was recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

92. Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

93. Despite this knowledge, Defendants decided to conspire with the terrorists.

## III. DEFENDANTS MADE PAYMENTS TO ISIS

94. Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Defendants proceeded to make millions of dollars in payments to terrorists. These payments came primarily through four mechanisms: (1) payments per truckload for buyer and supplier access to the plant; (2) volume-based payments for cement sold; (3) monthly fixed-rate payments; and (4) payments to ISIS-controlled suppliers. Defendants also knowingly sold cement to ISIS, which ISIS used to plan and carry out its acts of international terrorism.

95. Instead of leaving Syria, as other multinational companies had done, LCS saw the collapse of the country and increasing power of ISIS as an opportunity for further mutual enrichment and entrenchment by cooperating to sell more cement, at higher margins. Defendants continued paying ISIS and ANF because doing so increased profits.

### A. Lafarge And LCS Paid Terrorists $150 Per Truck To Pass Through Checkpoints

96. On August 26, 2013, Defendants' executives discussed a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards

Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." An executive associated with Defendants summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

97. By October 2013, Lafarge began paying money directly to ANF and ISIS to ensure they would permit trucks to pass. In early September 2013, a Syrian intermediary noted that it is "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

**B. LCS Paid Terrorists Based On Cement Sold**

98. As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and LCS. The agreement provided that ISIS would assess trucks 400 Syrian pounds for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

99. Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work. This is after they have fulfilled their dues to us."

**C. LCS Made Fixed Monthly "Donations" To Terrorists**

100. LCS also made fixed monthly "donation" payments to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

101. These payments, which, according to Lafarge and LCS's plea, exceeded $816,000 in total, began as early as July 2012, when armed groups started taking over territory around the Cement Plant. Defendants allocated between $80,000 and $100,000 per month to distribute to the armed groups around the factory.

102. Beginning in February 2013 and continuing through at least July 31, 2013, Defendants' intermediary advised a senior LCS executive that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

103. In a July 2, 2013 email with the subject line "Donations," a senior LCS executive calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds, or over $155,000 USD per month.

104. In an August 5, 2013 email with the subject line "Update on donations," a senior LCS executive wrote that "some elements on the donations were are paying to [the intermediary] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and . . . these donations are distinct from the monthly remuneration of our partner."

**D. LCS Paid Fixed Monthly Security Payments To Terrorists**

105. In November 2013, Defendants decided that they should make fixed monthly security payments to ISIS as well. In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to the intermediary and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which

included a five million Syrian pound monthly payment for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

106. On February 4, 2014, an LCS senior executive directed Defendants' intermediary to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton. Defendants' intermediary responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.

107. Following those meetings, it was advised that LCS increase payments to the terrorists. A March 31, 2014 email explained the extent of Defendants' investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? … As long as we are selling and are able to overcome the obstacles, we should continue.
>
> … We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are. In this case we have to pay about 300 milion SYP [approximately $2.7 million USD] monthly.

108. Defendants' monthly payments to terrorists (noted above) allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits for it—and for ISIS.

109. A May 8, 2014 email to LCS executives advised that LCS's operations were not impeded by local armed groups, stating "Daesh — PYD — Al Nusra — Abu Issa all we have good relations recently . . ." Defendants maintained "good relations" with ISIS and ANF by paying them ever-increasing amounts.

110. On September 15, 2014, LCS executives exchanged an email containing two attachments. The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds to "Daesh" [ISIS] as of May 1, 2014.

In a second attachment to the email, titled “Evolution of the security donations 2012-2013-2014,” it was listed, on top of the total amount of LCS’s monthly “donation” payments, an additional “10 MSYP [10 million Syrian pounds] paid on April 23 to ISIS to unlock the West road.”

**E. Defendants Purchased Materials From ISIS-Controlled Suppliers And Sell Cement To ISIS**

111. In addition to making regular payments to terrorists, Defendants purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS, making additional payments to terrorist-controlled suppliers totaling at least $3,447,528. They also sold cement to ISIS, knowing that ISIS intended to use the cement in terrorist activities.

112. As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement. LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS. Defendants also purchased oil from ISIS.

113. On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the agreement, ISIS would allow LCS’s suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqa to retain some of LCS’s payment for the raw material as profit.

114. In late 2013, a Syrian intermediary between Defendants and ISIS who had previously assisted LCS with environmental licensing, explained to LCS’s board that he wished to discuss “[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . .” The intermediary repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered. For example, in a September 24, 2013 email about

a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," the intermediary informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very sensitive about this issue."

115. As another example, in a September 28, 2013 email, the intermediary declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that. So far im on LCS side but please Im asking kindly to have my Fees."

116. Defendants' executives understood that transacting with ISIS in this manner was illegal.

117. In a December 7, 2013 email, Defendants' executives noted that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, it was determined that these activities were "needed for business continuity."

118. Thus, with Defendants' blessing, their representative intermediaries negotiated deals in which Defendants purchased critical raw materials for use in the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

119. In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal.

120. Defendants did not hand only money to ISIS. They also provided ISIS cement, even before ISIS took over the Cement Plant. In a 2014 email, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market." News reports confirm that Lafarge and LCS agreed to ISIS's request for cement. A former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them." The same LCS employee continued that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." Defendants "could do anything. They had deals with ISIS."

121. A former French intelligence analyst testified that Defendants sold cement to ANF and ISIS in Syria. In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them." News reports stated that "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the US-led coalition." Lafarge's cement helped ISIS extend its reach and ability to commit acts of international terrorism. ISIS used Lafarge's cement to fortify its network of underground tunnels and bunkers, used for hiding from and launching attacks against U.S. and coalition counterterrorism forces, including in northern Syria and near the Syria-Iraq border. It built fortified tunnels—on information and belief, requiring high-grade cement only LCS could provide—to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and aerial imagery. Defendants' cement sales thus directly aided the attacks on American citizens, servicemembers and coalition forces, including the attack that severely injured Plaintiff.

122. Likewise, as described below, Defendants knew and intended that it would receive concomitant benefits from their aid of and conspiracy with ISIS, including ISIS's acts of international terrorism.

## IV. DEFENDANTS CONCEALED THEIR PARTNERSHIP WITH DESIGNATED TERRORIST GROUPS

123. Defendants' support for ANF and ISIS directly and via intermediaries allowed them to dominate the cement market and increase profits. But the conspiracy was not without risks. Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws, including those of the United States, Defendants and their agents and co-conspirators took numerous steps to conceal their partnership with ISIS.

124. First, Defendants' executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge." For example, on September 16, 2013, a senior LCS executive instructed Defendants' intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS. He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

125. Second, and relatedly, Defendants had intermediaries—rather than Lafarge or LCS executives—engage directly with ISIS and ANF. As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by . . . middlemen, since an exposure of this sort would have been compromising for LCS." The LSC consultant concedes: "But via [the Syrian intermediary], we did in fact contribute to the economy of ISIS."

126. Not only did Defendants prefer to work through intermediaries, but they took steps to conceal the payments they made to them. In fact, Lafarge and LCS executives directed their specific intermediaries to submit invoices that did not reference their own names or the names of

their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

127. For example, on December 13, 2012, an email directed that any future invoice should not be on Defendants' Syrian intermediary company's letterhead, but instead should be on that of a company outside of Syria.

128. Third, in connection with their efforts to conceal payments and falsify records, Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to straw-man companies outside Syria and Iraq. LCS executives made clear that they preferred to transact through U.S. dollar bank transfers. A June 30, 2013, email explained, "[W]e cannot continue the way we are settling the turnover invoices. Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Defendants' intermediary in cash, which would appear more suspicious. Thus, Defendants instructed their ISIS intermediary, to create a new corporate entity in Dubai so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

129. An internal LCS email also instructed several employees that "we all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use code words, indicating that he was both aware of and concerned about disclosure of Lafarge's support for FTOs.

130. Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by the ISIS intermediary in Dubai confirmed that payments should be made in U.S. dollars. LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

131. Lafarge and LCS executives made similar efforts to disguise the nature of payments to another intermediary, including by directing that payments reference only environmental consulting and be made using U.S. dollars.

132. A few weeks later, on February 5, 2014, a senior LCS executive again required that payments reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD
>
> Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

133. A February 13, 2014 invoice, payable in U.S. dollars to the Syrian intermediary's company, purported to be for "[c]onsultancy services." International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

134. In addition, as another way to conceal their partnership with ISIS from French auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

135. LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing. Lafarge executives used private personal email accounts to communicate about the conspiracy, and thus avoided leaving incriminating

evidence on corporate email servers located in France that would be available to French auditors, regulators and law enforcement officials.

## V. LAFARGE AND LCS NEGOTIATED A LONG-TERM REVENUE AGREEMENT WITH ISIS

136. In 2014, Defendants' executives saw an opportunity to capitalize further on their business relationship with ISIS. The opportunity was mutually beneficial: if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues. Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.

137. A senior LCS executive proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement." Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement. It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

138. A July 14, 2014 email message from Defendants' Syrian intermediary to the senior LCS executive discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input about how much Lafarge's distributors should pay the terrorists "in addition to the **ten millions** that we pay directly to them, i.e. ISIS."

139. Negotiations continued throughout the summer and into fall 2014. In August 2014, LCS's new CEO was informed that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

140. The new CEO responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Defendants' Syrian intermediary said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

141. On August 5, 2014, a draft revenue-sharing agreement between LCS and ISIS was drafted. The next day, it was confirmed Lafarge's and LCS's agreement to a rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control, for the following six months:

- As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:
- ISIS will receive the payment of 750SP/ton, by customers, every two weeks.
- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees.
- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.
- The agreement is valid until February 5th, 2015.
- I hope the agreement to be signed today, and sales to restart tomorrow.
- ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

142. While Lafarge was aware that ANF and ISIS were classified as terrorist groups by the United States, United Nations, and European Union, business negotiations between Defendants and ISIS became more complicated on August 15, 2014, when the United Nations Security Council passed a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to

prohibit all financial and trade relations with the groups. On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

143. Defendants' executives were closely following these developments and understood that ISIS was a terrorist group. For example, on or about August 14, 2015, Defendants' executives exchanged emails about "ISIS and how much of our operational margin it is," noting: "PS In the same vein, we should not forget that ISIS is a terrorist movement." And, on August 18, 2014, an executive sent an email with the subject heading "terrorist watch list," and noted that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

144. On August 7, 2014, the United States began airstrikes against ISIS in Iraq, and in September 2014, began strikes against ISIS in Syria.

145. On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online. Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America." Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS finalized a revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

146. The executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014.

147. The notes from that meeting reflect that Lafarge wanted "to make sure that what we do is risk free (also vis-à-vis the U.S.)." Defendants knew that their partnership with ISIS was illegal under U.S. law and would have consequences in the United States.

148. Lafarge had now solidified its shared objectives with ISIS. Each co-conspirator, including Defendants, intermediaries, and ISIS, would make money by having ISIS use force and violence to block cheaper imported cement to increase LCS's sales. The parties thus collaborated to directly finance ISIS's growing terrorist attacks, including those that killed or severely injured servicemembers, such as Plaintiff.

## VI. ISIS SEIZED THE CEMENT PLANT

149. On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action. President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

150. In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region. Even in the face of this grave threat from ISIS, Defendants' executives wanted to continue with the conspiracy. One executive argued against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger . . . we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

151. Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan to shut down the plant machinery and keep it from still being operational in terrorists' hands, or to safely evacuate local staff. When ISIS informed employees early in the

morning of September 18, 2014, that it intended to advance on the plant, executive ordered the remaining team to "prepare mattresses, food, water, sugar" and shelter in the plant's electrical tunnels rather than evacuate. Indeed, there were no cars at the plant with which the employees could evacuate. The employees who remained to oversee the plant's shutdown had to hitch rides with the fleeing canteen vendors and on local buses.

152. In their departure, LCS employees left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running as the machinery cooled when they left.

153. ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the Cement Plant. In the Cement Plant, ISIS took what it wanted. ISIS seized the cement that Defendants had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million. The actual value of the cement and other materials was much higher. According to publicly available French intelligence reports and media reports, ISIS seized materials worth approximately $25 million. It seized raw materials at the Cement Plant including hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks. Defendants' Syrian intermediary negotiated the disposition of these remaining materials for approximately $11.5 million. Thus, according to French intelligence, following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved." In December 2014, a Syrian intermediary visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

## VII. AFTER EVACUATING THE CEMENT PLANT, DEFENDANTS ATTEMPTED TO CONCEAL THEIR PARTNERSHIP WITH ISIS

154. After Defendants' employees fled the Cement Plant, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that their intermediary's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

155. Specifically, on September 29, 2014, the intermediary explained that, in response to their prior requests, he had opened a bank account in Dubai in the name of a new company that was not publicly linked to him.

156. In a, October 9, 2014 internal email, Defendants' executives sought a new contract for Defendants' Syrian intermediary and explained that LCS owed him "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [a Syrian intermediary] to PYD: 10.5 M SYP = 60kUSD)" totaling "210kUSD." An LCS executive further wrote that the in-house lawyer "would like to terminate the previous contract [with the Syrian intermediary] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014." In a subsequent email on October 14, another executive clarified Lafarge would not pay the Syrian intermediary without a new backdated contract.

157. A senior executive then sent Defendants' Syrian intermediary an email with the subject line "Agreement for Regional Security Consulting Services," which attached copies of (1) the new consulting agreement between a holding company created by LCS ("LCS NewCo") and the intermediary's new company and (2) the backdated Termination Agreement between LCS and the new company.

158. In the cover email, it was further explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment compensated the Syrian intermediary for work he had already performed negotiating an agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to terrorist groups, including ISIS.

159. In addition to the lump sum payment to compensate him for work he had already performed, Defendants continued to pay the Syrian intermediary to work with ISIS. Those payments for ISIS, including to or through the intermediary, continued after Lafarge left the Cement Plant, according to a post-dated contract and reports. The new consulting agreement with the intermediary required the Defendants to make monthly payments of $30,000 on a going-forward basis.

160. The Termination Agreement with the intermediary was backdated to August 18, 2014, the day LCS employees fled the Cement Plant. The metadata of the backdated Termination Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, two weeks after LCS had evacuated.

161. On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, the intermediary sent an invoice for USD $210,000. Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to the new company's account at a financial institution in Dubai.

162. On information and belief, any additional U.S. dollar payments due under the Consulting Agreement were paid after October 2014 in the same manner.

163. Legal proceedings against Lafarge in France revealed that the Syrian intermediary continued to negotiate with Lafarge for payment for materials in the plant. According to a publicly available French intelligence report, at a meeting between the parties in December 2014, Lafarge handed over 65,000 tons of cement, worth $6.5 million. At the meeting, ISIS representatives signed a contract for an additional $5 million of the cement left at the plant. Following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved," stated the intelligence report.

## VIII. WITH ITS DEEP POCKETS, ISIS CONTINUED TO TERRORIZE AND WREAK HAVOC

164. Flush with cash from its dealings with Lafarge—at a minimum $5.92 million to as much as $15 million in cash and more in kind—ISIS continued to build improvised explosive devices ("IEDs") and commit terrorist attacks.

165. IEDs were the most important weapon in ISIS's arsenal. According to Mark Wilkinson of the United Nations Mine Action Service, ISIS's IED production included mortar bombs, air-dropped munitions, suicide belts, missile enhancements, launchers, and entire vehicles that were either remote, self-, or victim-activated, amounting to "a level, scale, and quality of arms manufacturing . . . equivalent to conventional arms manufacturers."

166. In Manbij, ISIS left thousands of tiny explosive devices "in doorways and windows, under mattresses and piles of shoes, in refrigerators and bags of clothes, and in television sets and kitchen sink taps."

167. Plaintiff was severely injured by one such IED explosion in Manbij.

168. ISIS deployed IEDs both to kill the U.S.-led coalition forces and to kill, maim, and terrify civilians and sow distrust among the population, in order to displace, influence, and intimidate local and foreign governments.

169. As the United States fought back against ISIS in Syria and Iraq from 2014 onward, ISIS terrorized and targeted the oncoming forces at every step. Its primary weapons were IEDs planted in buildings, on roadways, and in vehicles. Individuals specially trained in IED disposal risked their lives daily to defuse IEDs, saving the lives of their fellows. Had ISIS not developed the IED-making expertise and violent capacity it built in 2013-14, materially supported by the resources Defendants provided it, ISIS would not have been able to deploy the IEDs and commit the attack that severely injured Plaintiff.

170. ISIS was not dislodged from Iraq until October 2017. It was finally pushed out of all the territory it controlled in Syria in March 2019.

## IX. LAFARGEHOLCIM ULTIMATELY DISCLOSED THAT LAFARGE AND LCS TRANSACTED WITH TERRORISTS

171. In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, which resulted in the combination of the two largest building materials companies in the world. The payments to terrorists were not disclosed to Holcim or its representatives during pre-acquisition due diligence meetings. Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company.

172. On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

173. On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists: as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact

with these armed groups." It also was noted that "LCS management [had] kept Lafarge SA well-informed of developments."

## X. DEFENDANTS' PAYMENTS AND COOPERATION SUBSTANTIALLY ASSISTED THE ACTS OF INTERNATIONAL TERRORISM THAT INJURED PLAINTIFF

174. Defendants made payments to ISIS and ANF that financed their operations, including acts of international terrorism that injured Plaintiff. Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed.

175. Lafarge sought to partner with ISIS *because of* its ruthlessness and brutality. Lafarge did not only pay into the protection racket ISIS enforced. It sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of all of the Cement Plant's profit. In return, ISIS carried out exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

176. The millions of dollars Defendants gave ISIS materially enhanced ISIS's and ANF's ability to expand or sustain their power and territorial control by committing the terrorist attacks described herein, as Defendants foresaw and intended for their own financial benefit.

177. The extent of ISIS's funding was fully apparent in the city of Manbij, a large city approximately 60 kilometers from the Defendants' Cement Factory. ISIS was in total control of the city of Manbij, where its well-funded and sophisticated operations reflected substantial funding that allowed ISIS to build complex military infrastructure and defense of the city. These defenses included a large and complex tunnel system, weapons manufacturing, military mines and obstacles, overhead concealment to prevent the use of American air power and anti-aircraft weapons. ISIS's

sophisticated operations in Manbij were obviously the byproduct of significant funds, including those funds provided by Defendants.

178. Furthermore, the cost of ISIS's and ANF's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants.

179. ISIS fighters received a base pay of $200-400 per month. Just $5,000 to ISIS or ANF could have paid 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could purchase dozens of bomb components or finance multiple complex attacks. ISIS publicly confirmed in a video that it deployed its "taxes," that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight. The money ISIS got from Lafarge was used to pay fighters, control territory and markets, and commit terrorist attacks.

180. Lafarge pled guilty and admitted giving ISIS and ANF $5.92 million. Lafarge also left millions of dollars of cement in ISIS's hands, or sold it to them directly. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on its attacks was money, not manpower. As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad."

181. Defendants' payments, given at a time when ISIS was looking to expand and commit attacks, materially strengthened the terrorists' ability to commit attacks that killed and injured American citizens, including the attack that severely injured Plaintiff. Indeed, following the payments by Defendants, ISIS attacks against Americans increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014, which ISIS announced as horrific 'Message[s] to America.'

182. ISIS's targeting of Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Libya, Syria, Iraq, and other countries around the world.

183. The money Defendants admitted to placing in ANF's and ISIS's hands from 2012-14 had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, according to a U.S. government report, ISIS continued to hold onto amounts of "stockpiled cash." Moreover, the cement that Lafarge handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Lafarge's cement would have lasted past 2014. Defendants admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later, including the attack that severely injured Plaintiff; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later.

184. ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets." The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces' financing. Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas in which it operated.

185. Defendants' payments of course had an especially close nexus to ISIS's acts in Iraq and Syria. ISIS, which originally formed in Iraq before becoming primarily centralized around

Raqqa in Syria, controlled all of the territory around the Cement Plant. Because of ISIS's structure and organization, Defendants' payments were specifically funneled to certain cells. The following ISIS cells played a key role in both handling Defendants' money and planning or committing the attacks that targeted and severely injured Plaintiff and other American citizens.

**A. Lafarge's Money Was Used To Harm Plaintiff**

186. **ISIS's Leadership Cell**, also called the "Shura Council," "Governance Council," or "Delegated Committee," was, during relevant periods, a unified leadership group that approved new ISIS membership, expansion plans, and strategy. ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors. It ensured that all major ISIS actions were in accord with ISIS's overall strategy. ISIS's predecessor ISI's known funding structures required that 20% of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices. According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under its control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [al-Baghdadi and the group's leadership], which redistributed the funds as needed." ISIS was a remarkably centralized group, with the Leadership Cell commanding specific areas to expand or stop sending fighters and with all fighters loyal to the same authority under Al-Baghdadi. According to multiple sources, including its magazine Daqbiq and a guide to its "tax" practices, ISIS mandated payment amounts depending on its interpretation of Islamic law. This interpretation specified that twenty percent of goods such as spoils of war and of underground or mineral wealth be paid to ISIS's central funds. It is likely that twenty percent of the funds Defendants have admitted to paying ISIS went to Al-Baghdadi and the Leadership Cell (over $1.1 million U.S. dollars), to plan and execute the acts that harmed American citizens, including Plaintiff who was severely injured by an ISIS IED. Specifically, the funding supported the following acts of international terrorism:

187. **Attacks on U.S. Servicemembers in Syria and Iraq**: Al-Baghdadi and the Leadership Cell planned and authorized ISIS's attacks against the United States and its servicemembers inside ISIS's territory in Syria and Iraq from 2014-17, including the ISIS IED attack that injured Plaintiff.

188. The Leadership Cell's role included: (1) financing ISIS's cells and operatives to commit such attacks; (2) ordering ISIS's members to specifically target and attack the United States within Syria and Iraq; (3) supervising ISIS's strategies and tactics to target the United States in Syria and Iraq; (4) deploying a strategy to leverage American deaths and injuries to pressure others to submit to ISIS; and (5) using American deaths and injuries to increase ISIS's influence, recruit members and maintain and expand its control over territory and markets.

### B. Lafarge Channeled Funds Into ISIS's Center In Raqqa, Which Used The Money To Harm Plaintiff

189. The Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

190. As the capital, ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks. A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was "where

[ISIS's] plotting takes place. Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."

191. ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

192. In December 2014, Abu Luqman himself was present, alongside Lafarge's agent intermediary, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, at Defendants' expense, the intermediary visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

193. **Attacks on U.S. Servicemembers in Syria and Iraq**: Abu Luqman and the Raqqa Cell participated in planning and authorizing ISIS's attacks against the United States and its servicemembers inside ISIS's territory from 2014-17. Abu Luqman, commander of the Directorate of General Security, collected intelligence and developed plans to commit attacks specifically targeting Americans. The Raqqa Cell provided funds, fighters, training, resources, and propaganda, and aided in planning and training the fighters who committed the attacks that severely injured servicemembers, including Plaintiff.

## XI. DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES

194. Defendants' scheme to finance ISIS and ANF relied on substantial touchpoints with New York and the United States. In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge and LCS admitted that their "offense occurred in part within the United States." That concession reflected several U.S. contacts that Defendants formed in effectuating their scheme. Those U.S. contacts included: (1) Defendants' intentional use of New York banks to clear their U.S.-dollar transactions; (2) Defendants' use of U.S.-based email services; and (3) Defendants' conspiracy with ISIS and ANF, designated terrorist groups that purposefully targeted the United States and reached into U.S. territory to further the scheme.

195. Plaintiff incorporates by reference the Court's August 29, 2025 Order in related cases, as noted above. *See Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025). (*see supra* at ¶¶ 46-47). In addition, Plaintiff alleges additional facts relating to Defendants' nexus to New York.

196. Defendants purposefully availed themselves of New York's banking system by executing wire transfers they intentionally caused to clear through New York banks.

197. Defendants' payments to terrorists relied on correspondent and intermediary banks located in New York.

198. Defendants relied on New York banks to clear many of their transactions supporting ISIS and ANF.

199. LCS's unique U.S.-dollar liquidity constraints amplified the nexus between Lafarge's upstream payments and LCS's downstream payments to terrorists. Starting in 2011, LCS faced a severe liquidity crunch in U.S. dollars. For LCS to come up with the money to pay terrorists, therefore, Lafarge had to devise a plan to ensure that LCS had a steady supply of U.S.

dollars. But it was difficult for LCS to raise money, given sanctions affecting Syria. The best way for LCS to access the capital it needed to pay terrorists was thus to obtain U.S. dollars from Lafarge Cyprus and other affiliates. In fact, had Lafarge not agreed to loan U.S. dollars to LCS in April 2011, LCS would have defaulted on its debt covenants with its senior lenders and would likely have had to shut down its Syrian plant altogether.to leverage the power of New York's banking system to impede terrorists from raising money and funding their operations.

200. U.S. sanctions designations were similar. In 2014, for example, the Treasury Department emphasized that U.S. sanctions sought to deprive violent Syrian actors of U.S. dollars and force them to use the collapsing Syrian pound. The United States reinforced that the same logic applied to ISIS when it sanctioned ISIS financiers from 2016 through 2019: allowing ISIS to access U.S. dollars through New York banks directly financed ISIS's attacks by giving ISIS more purchasing power than it would have had by using Syrian pounds.

201. When Defendants made their 2011 upstream payments, they knew terrorist violence was a foreseeable consequence. From 2003 through 2014, many public sources – including U.S. and U.N. counterterrorism findings – alerted Defendants that the Syrian regime sponsored AQI attacks targeting the United States. DOD, for example, reported that Syria provided "safe haven, border transit, and limited logistical support" to "Iraqi insurgents," including AQI. U.N. Security Council reports similarly highlighted the "nexus between large numbers of Al-Qaida affiliated foreign fighters and Jabhat-al-Nusrah" in Syria, which risked "new pan-Arab and pan-European networks of extremists emerg[ing]."

202. The suite of U.S. and U.N. antiterrorism sanctions on Syria – which Defendants schemed to circumvent – strengthened the nexus between their 2011 payments and terrorism. Because Defendants knew that their Syrian intermediary was a prominent Assad ally and regime

cutout facilitating Defendants' business interests in a heavily sanctioned country, it was foreseeable that their dealings with him in 2011 would enable AQI/ISIS terrorist attacks against the United States.

203. Defendants also knew their intermediary personally had facilitated AQI terrorism by brokering arms deals, participating in U.S.-dollar-denominated illicit Oil-for-Food program transactions, and channeling hundreds of millions in Iraqi oil revenue stranded in Syrian banks to terrorist financiers in Iraq and Syria. Those dollars and illicit weapons supported the Zarqawi network, which powered AQI's regional expansion and its evolution into ANF and ISIS. By funding a joint venture with a notorious AQI financier, Defendants' 2011 upstream payments implemented a scheme of which terrorism was a foreseeable consequence. Had Defendants been unwilling to pay AQI or similar FTOs in Syria, they never could have hired their Syrian intermediary because their ordinary due diligence would have never "cleared" him.

204. Lafarge and LCS continuously paid their Syrian intermediaries in U.S. dollars to maintain good relations with violent Syrian actors. Those efforts focused at first on the Assad regime and AQI, and they later evolved to include ISIS and ANF. All reflected a continuous course of conduct dating back at least to 2010.

#### 1. Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York

205. When Defendants ordered the U.S.-dollar transfers, they instructed their banks to execute the wires knowing they would clear through New York.

206. Defendants' internal documents reflected their understanding that U.S.-dollar wires typically require New York clearing.

207. Defendants fared better in executing other U.S.-dollar transactions through New York correspondent accounts. Lafarge often received invoices calling for U.S.-dollar execution.

208. Syrian government decrees likewise alerted Defendants that their U.S.-dollar transactions depended on the U.S. banking system. For example, in February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S.-dollar clearing by New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that "US laws stipulate that any dollar transfers must pass through the US banking system."[3]

209. Defendants were intimately involved in directing and routing the U.S.-dollar transfers they executed. They did not leave the routing decisions to their banks; the details were too important to Lafarge. Defendants belonged to a sophisticated multinational conglomerate that employed large treasury and back-office teams to supervise their banks and to manage their currency exposure across several markets. For that reason, Defendants regularly communicated with their banks about how to route their money, including with respect to the correspondent banks used.

**2. Defendants Purposefully Benefited From New York Clearing**

210. Defendants' New York contacts enhanced the potency of the aid they gave to ISIS and ANF. Not every payment made was in U.S. dollars. But Defendants' preference was to pay in U.S. dollars when possible, and using U.S. dollars (even if not exclusively) was critical to the conspiracy. Indeed, Defendants' ability to reliably transfer U.S. dollars – which depended on their access to New York's banking system – was vital to the scheme's success. Defendants' conscious choice to use U.S. dollars and New York banks offered at least three benefits.

[3] BBC International Reports (Middle East), *Syria Replaces Dollar With Euro For State Transactions* (Feb. 24, 2006) ("Text of report by Hayam Ali headlined 'The euro used in state transactions', published by Syrian newspaper Al-Thawrah website on 13 February [2006]").

211. *First*, transacting in U.S. dollars through U.S. banks helped Defendants legitimize their payments and reduce unwanted scrutiny from outside auditors. Given the deteriorating security situation in Syria, and the resulting U.S. and international sanctions, Lafarge's Syrian operations faced significant financial scrutiny. Also, at the time, Syria's financial system was in severe distress, plagued by rapidly spreading black markets for illicit financial activity. By contrast, the U.S. dollar was the global reserve currency for legitimate transactions among established, multinational businesses.

212. *Second*, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk. Due to international sanctions and Syria's civil war, the value of the Syrian pound plummeted during Defendants' scheme.

213. *Third*, Defendants' payments satisfied ISIS's and ANF's general preference for U.S. dollars. Real-time public reports linked ISIS's fundraising prowess – and its recruiting success – to its stockpile of U.S. dollars. As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money. ***After joining [ISIS], people are paid in US dollars instead of Syrian liras***. . . . ISIS members receive additional incentives to fight for the group. "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said]. "It cost $50 per month. [ISIS] paid for the house, the electricity. Plus, I was married, so I got an ***additional $50 per month*** for my wife. If you have kids, you get ***$35 for each***. If you have parents, they pay ***$50 for each parent***. This is a welfare state." And ***those financial benefits are not just limited to the organization's fighters.***[4](emphasis added)

214. Investigative reports sourced to witnesses from inside ISIS's territory reinforce that connection. For example, according to the *Independent*, a leading British newspaper that has covered ISIS extensively since its inception, the "Islamic State was already known to pay its

[4] Jeremy Bender, *An ISIS Defector Explained A Key Reason People Continue Joining The Group*, Bus. Insider (Nov. 18, 2015), https://tinyurl.com/3ced6xs5.

recruits in [U.S.] dollars, sell[ ] oil and looted antiques for dollars, and accept extorted taxation and hostage money in dollars."[5] ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having built a financial system entirely dependent on the US dollar."[6]

215. Defendants' reliance on New York banks helped them capture all these benefits of their U.S.-dollar payments. New York is the global hub of cross-border U.S.-dollar transfers for good reason: companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing.

216. New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions. Had Defendants routed those transactions through non-U.S. banks, rather than New York banks, they would have exposed themselves to credit and operational risk, and likely would have had to pay higher banking fees as well.

217. Defendants experienced those operational risks first-hand. By August 2011, U.S. sanctions were substantially constricting Defendants' ability to route U.S. dollars in and out of Syria. Defendants strongly preferred to transact in U.S. dollars: that is how Lafarge made its upstream payments until August 2011, and it is how Defendants wanted to proceed even after President Obama ratcheted up sanctions in August 2011. But U.S. sanctions effectively blocked Lafarge and LCS from continuing "to wire USD to Syria" because they stopped New York banks from clearing the wires. In 2012, therefore, Lafarge had to start paying LCS by wiring money in Euros, after which LCS would "buy USD on shore."

---

[5] Lizzie Dearden, *ISIS' Attempt To Topple US Economy With Own Currency 'Failing' As Reliance On American Dollars Increases*, Indep. Online (UK) (Mar. 26, 2016), 2016 WLNR 9336286.

[6] *Id*.

218. The Treasury Department repeated a similar warning on October 16, 2014, eight days before Defendants' $210,000 wire to their Syrian intermediary, when it sanctioned a violent, Syrian-regime-affiliated actor. The designation emphasized that U.S. sanctions on Syria sought to deprive violent Syrian-related actors of U.S. dollars and force them to instead use a collapsing Syrian pound, reducing their ability to fund the kidnapping and murder of innocent victims in Syria.

### A. Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme

219. In carrying out their scheme to pay ISIS and ANF, Defendants also reached into the United States to avail themselves of U.S.-based email services. Defendants' use of those services formed additional U.S. touchpoints and allowed Defendants to reap the benefit of their email providers' U.S. presence. Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

220. Defendants' use of these email accounts was purposeful. As Lafarge and LCS admitted, their executives and agents used "U.S.-based email service providers," rather than their "corporate email addresses," in a conscious effort "to conceal their conduct from others within and outside of LAFARGE and LCS."

### B. Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States

221. As alleged above, Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

222. ISIS was good for Lafarge's business in Syria. Most fundamentally, ISIS's terrorist activities helped drive from Syria virtually every other Western company, leaving Lafarge with minimal competition for the Syrian market. So long as the terrorists remained in power, Lafarge's unusual willingness to do business with them gave it a unique opportunity to seize market share.

ISIS's protection racket also delivered Lafarge a more specific benefit: the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors. That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in LCS's economic interest." Their commitment worked, at least for a time. Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."

223. The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS" – is undisputed and apparent on the face of Lafarge's guilty plea. The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "***share the 'cake'***" of their mutual enterprise – with Lafarge executives reasoning that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well." That sentiment reflected Lafarge's recognition that ISIS could be good for business. As LCS's former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria." The resulting relationship went beyond passive payments. As Deputy Attorney General Monaco stated, Lafarge "***partnered with ISIS***, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."[7]

224. Terrorist violence was vital to that agreement. For Lafarge to reap the benefits of its conspiracy with ISIS, two things had to be true: (1) ISIS had to retain control of its territory; and (2) ISIS's protection rackets had to remain effective against Lafarge's would-be competitors. Neither could work without terrorist violence and coercion. For example, as *Janes*, the iconic

[7] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022) (emphasis added).

defense industry publication, observed, ISIS "relies on informants and operatives who threaten and pressure the local population to pay extortion money. Islamic State's frequent small arms and improvised explosive device (IED) attacks . . . act as a reminder of the imminent threat and presence of the militants."[8] Violence thus was crucial to the racket, because it lent credence to ISIS "intimidation" and "pressure" on local entities to "pay levies" the group demanded.[9]

225. ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined. For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[ ] jihad"; and that ISIS's maintenance of the racket was backed by the threat of violence against others, including the potential to execute ISIS's enemies. Similarly, ISIS offered a purported religious mandate for its taxes, with punishments (including execution) threatened against those who did not pay. When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

226. In furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States. In building their territorial control and strengthening their protection racket, ISIS committed many terrorist attacks aimed at the United States. As Deputy Attorney General Monaco stated in connection with Lafarge's and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families

---

[8] Shady Alkhayer, *Money Flow: Islamic State Continues To Finance Operations In Central Syria Through Extortion And Intimidation*, Janes (Sept. 2, 2022), 2022 WLNR 27802943 (emphasis added).

[9] *Id*.

whose loved ones were brutally murdered by ISIS."[10] ISIS publicly celebrated those acts and made clear, both before and during Defendants' conspiracy, that its efforts to grow its caliphate relied on an ongoing terrorist campaign aimed at the United States.

227. ISIS's specific attacks on Plaintiff and other American citizens also furthered the conspiracy. For example, ISIS captured and beheaded James Foley and Steven Sotloff to send a message of intimidation and control, including by publicizing the brutal murders in videos titled "A Message to America" and "A Second Message to America," respectively. The capture of these American journalists helped ISIS's conspiracy with Defendants by strengthening ISIS's territorial control and bolstering the credibility of ISIS's threats against others, including Lafarge's competitors.

228. Scholarly analyses confirm that connection. As terrorism scholars Clarke and Williams wrote, "Da'esh . . . used kidnapping as a weapon against its enemies—particularly the United States" given that the U.S. government "refused to pay[] ransoms for the release of its citizens" and therefore ISIS believed that attacks that targeted Americans could serve as "an important fund-raising method" like "was done with U.S. journalist James Foley" because "***the great virtue of kidnapping is that it can be used symbolically*** to spread fear and deliver a message of defiance." They continued:

> This was done with U.S. journalist James Foley who was captured in 2012; a video of his execution was released in August 2014. Although Da'esh in an e-mail communication with Foley's family had demanded millions for his release, how serious this was remains uncertain. After Foley was executed, Da'esh, in what Cragin and Padilla contend was an attempt to ***embarrass and humiliate the United States***, claimed that Obama was to blame. Yet the profit motive might also have been present: the ***killing of Foley certainly increased***

[10] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022).

> ***the pressure to pay for the release of hostages*** from other countries to ensure they did not share the same fate.[11] (emphasis added).

As that analysis illustrates, protection rackets work only if the threat of violence is credible. And ISIS could make good on its promise to block competing cement only if it convinced Lafarge's competitors that there would be consequences if they said no.

229. There was no more effective way for ISIS to accomplish those goals than to publicly kill and maim Americans. Given the United States' status as the sole global superpower, ISIS's public attacks on Americans conveyed unique credibility to its enemies. For example, as Dr. Daniel Byman explained in 2014, ISIS perpetrated "[a]cts of senseless violence and unspeakable brutality" that targeted the United States because:

> Videos showing the beheadings of captured US . . . citizens in particular are ***designed to send a message to American . . . people***: stay out of our business. . . . Islamic State believes that the people in [America] are reluctant to become entangled in yet another war in the Middle East and that savagely murdering an American . . . each time the US . . . government starts to get involved will make them even more so. They [believe] that the United States does not have the stomach for a tough fight and will pull out of a conflict as soon as Americans start getting killed.

230. Given the United States' unique military credibility, ISIS's attacks on U.S. servicemembers in Syria including Plaintiff, likewise furthered the conspiracy. As Secretary of Defense Ashton Carter publicly observed in 2016, "ISIL has demonstrated a clear intent to target U.S. servicemembers and facilities." Nowhere was this more true than in Syria and Iraq, where ISIS, and AQI before it, long touted the unique symbolic value of its attacks on U.S. servicemembers, which the terrorists used to amplify their broader message to everyone in Syria and Iraq that ISIS remained a threat and that America was weak.

[11] Clarke & Williams, *Da'esh In Iraq And Syria* at 33 (emphasis added).

231. ISIS also reached into the United States to further the conspiracy. For example, ISIS transmitted threats inside the United States, including to the Foley, Sotloff, and Mueller families, as part of its strategy to intimidate the United States. Other acts involved former residents of this District. For example, on May 24, 2022, a federal jury in this District convicted Mirsad Kandic – a former Brooklyn resident – of providing material support to ISIS, including by assisting ISIS's media department and facilitating travel for ISIS terrorists.[12] ISIS also sought to finance other attacks in the United States including by sending thousands of dollars to Maryland resident Mohamed Elshinawy in 2016 to encourage terror attacks.

232. ISIS also enticed hundreds of U.S. citizens to join its ranks by targeting the United States for recruitment. Roughly 300 U.S. citizens joined or attempted to join ISIS, in part because ISIS tailored its propaganda to U.S. audiences. For example, ISIS members sought to capitalize on unrest in Ferguson, Missouri and Baltimore, Maryland, asking protestors in those cities to join ISIS. ISIS also sent money to U.S. citizens to fund terror attacks on U.S. soil and sought and received funding from U.S. citizens to finance operations in Syria and Iraq.

233. The U.S. government has recognized, on a bipartisan basis, that ISIS specifically targeted the United States, servicemembers and other Americans for attack. For example, in 2022, the White House observed that "ISIS has directed terrorist operations targeting Americans . . . in the Middle East, Africa, and in South Asia,"[13] which echoed a White House observation in 2018 that "ISIS remain[ed] the . . . primary transnational terrorist threat to the United States" . . . "and

[12] Jury Verdict, *United States v. Kandic*, No. 17-cr-00449-NGG (E.D.N.Y. May 24, 2022), Dkt. 321.

[13] President Joseph R. Biden, Jr., *quoted in* White House, *Remarks by President Biden on a Successful Counterterrorism Operation* (Feb. 3, 2022), https://tinyurl.com/4vcfbsd6.

its senior leaders continue to call for attacks against the United States,"[14] similar to the view expressed by the U.S. government, in 2015, that ISIS's "strength and expansionist agenda pose an ongoing threat to . . . U.S. facilities and personnel in [] the Middle East."[15]

234. ISIS's contacts with the United States were foreseeable to Defendants. Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against American citizens. As Assistant Attorney General Olsen explained, Defendants partnered with ISIS and ANF "at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."[16] And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end. That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East. Indeed, Defendants specifically understood – in part through their intermediary and LCS's former risk manager – that ISIS and ANF were AQI's successors and were continuing AQI's terrorist campaign against the United States. The attack that severely injured Plaintiff and the attacks that killed or severely injured other American citizens, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

235. Given Defendants' knowledge of AQI's (and later ANF's and ISIS's) practice of targeting of U.S. nationals, including U.S. servicemembers, based on multiple U.S. government

---

[14] White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 1, 2018).

[15] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment*, at 12 (Aug. 24, 2015).

[16] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

statements and warnings to that effect, Defendants' illegal payments directly to those groups independently constituted conduct that was expressly aimed at the United States.

## XII. ACTS OF INTERNATIONAL TERRORISM THAT RESULTED IN PLAINTIFF'S INJURY

### A. Attacks On U.S. Servicemembers In Iraq And Syria

236. The millions of dollars Defendants gave as material support to FTOs substantially assisted sophisticated ISIS attacks against U.S. servicemembers in Syria including against Plaintiff. This attack occurred during or after Defendants' payments to ISIS and thus benefited directly from these payments. Defendants' material support was linked directly to the attack that severely injured Plaintiff, as this support allowed for ISIS to target the United States and U.S. servicemembers in Syria through the participation of ISIS's Leadership Cell, Raqqa Cell, and Abu Luqman, as well as its sale and delivery of cement to ISIS.

237. In Syria Plaintiff was assigned to Special Operations and operated in Manbij, a major city and ISIS stronghold. Among other things, he was responsible for undertaking numerous mission-critical tasks as part of an effort to secure Manbij.

238. In August of 2016, Plaintiff attempted to enter a former Command Post of ISIS. This triggered the detonation of an explosive device ISIS had left as a trap. As a result of the explosion, Plaintiff sustained serious injuries across his body.

## COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d) (JASTA, Conspiracy Liability)

239. Plaintiff incorporates the allegations above.

240. Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

241. ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that injured Plaintiff, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

242. Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

243. Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

244. "These conspiracies advanced Defendants' economic motives while simultaneously advancing ISIS and ANF's political motives by maintaining their foothold in the region." *Finan v. Lafarge S.A*., No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *22 (E.D.N.Y. Aug. 29, 2025).

245. The terrorist attack that injured Plaintiff was an act of international terrorism committed by ISIS. This was a violent act and an act dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f )(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

246. The terrorist attack that severely injured Plaintiff, like the terrorist attacks on other U.S. servicemembers, was intended to influence the government of the United States and the governments of coalition partners.

247. The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, Lebanon, and Libya;

to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, Turkey, Lebanon, and Libya; and to affect the conduct of the governments of Syria, Iraq, the United States, Turkey, Lebanon, and Libya by means of mass destruction, assassination, and kidnapping.

248. Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organizations in violation of 18 U.S.C. § 2339B. Defendants, ISIS, and ANF also structured their transactions to disguise the nature of their support, in violation of 18 U.S.C. § 2339A. These FTOs foreseeably attacked U.S. interests, including coalition forces and U.S. servicemembers, including Plaintiff, throughout the conspiracy, with Defendants' knowledge.

249. The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

250. Plaintiff is a U.S. national who was injured in his person, by reason of Defendants' conduct. Plaintiff has suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

251. As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiff is entitled to recover economic and noneconomic damages, including solatium damages.

## JURY DEMAND

252. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff requests that the Court:

(a) Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b) Award Plaintiff compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);

(c) Award Plaintiff his attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);

(d) Award Plaintiff prejudgment interest; and

(e) Award Plaintiff any such further relief the Court deems just and proper.

Dated: September 28, 2026

Respectfully submitted,

PAUL HASTINGS LLP

By: ______________________
Sara Tomezsko
200 Park Avenue
New York, NY 10166
(212) 318-6267
saratomezsko@paulhastings.com

Allyson B. Baker (*pro hac vice forthcoming*)
Meredith L. Boylan (*pro hac vice forthcoming*)
2050 M Street, NW
Washington, DC 20036
(202) 551-1830
allysonbaker@paulhastings.com
meredithboylan@paulhastings.com

*Attorneys for Plaintiff*